IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| NOT AN LLC d/b/a/ JSD SUPPLY,<br><br>Plaintiff,<br><br>v.<br><br>BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; UNITED STATES DEPARTMENT OF JUSTICE; and GARY M. RESTAINO AS THE ACTING DIRECTOR OF ATF,<br><br>Defendants. | Case No. 2:22-cv-00747-WSS |

**JSD SUPPLY'S SUPPLEMENTAL BRIEF**

### A. Plaintiff Has Standing to Challenge the Constitutionality of ATF's Actions and the Case is Ripe.

To have Article III standing, a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citations omitted). To show injury, a plaintiff must have "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id*. at 1548 (citation omitted). Plaintiff's injuries are well documented in its Verified Complaint and have not been challenged by the Defendants.[1] Next, these injuries are a direct result of and inextricably linked to ATF's conduct – which JSD asserts is unconstitutional – without which Plaintiff would have continued sale of its 80% frames and receivers and firearms parts, all of which previously have been authorized by the agency, and none of which are "firearms" as defined by the GCA. Finally, Plaintiff's claims are redressible by this Court, as a determination that ATF's actions, including its (incorrect) interpretation of the GCA, are unlawful and unenforceable will allow Plaintiff to resume lawful business activities free from the agency's unfounded threats. Clearly, there is Article III standing, particularly given the Constitutional claims raised by Plaintiff.[2]

---

[1] *See* Compl. ¶2 (alleging that Plaintiff has been forced to "immediately suspend[ed] all retail sales of its entire product line, causing immediate and substantial financial losses" and that ATF's conduct violated the Fifth and Second Amendment rights of Plaintiff); at ¶207 (financial harm); at ¶209 (expected loss of employees); at ¶211 (lost goodwill); at ¶¶ 163-164, 184, 186, 224 (attempts to prematurely implement Final Rule); and at ¶¶ 243-244 (due process violations).

[2] In *Sandvig v. Barr*, 451 F.Supp.3d 73 (D.D.C. 2020), Judge Bates explained that a litigant "may establish the requisite ongoing injury when seeking to enjoin a [statutory interpretation] alleged to violate" a constitutional right by showing intent "to engage in a course of conduct arguably affected with a constitutional interest, but … 'arguably' proscribed by statute … and there exists a credible threat of prosecution thereunder … When constitutionally protected conduct falls within the scope of [the government's interpretation of ] a criminal statute, and the government 'has not disavowed any intention of invoking the criminal penalty provision,' plaintiffs are 'not without some reason in fearing prosecution' and have standing to bring the suit.'" *Id*. (citing *Babbitt v. United Farm Workers Nat. Union,* 442 U.S. 289, 302 (1979)). Such is the case here.

### B. Plaintiff's Challenge to ATF's Actions Under the APA is Ripe.

In addition to Plaintiff's constitutional claims, the APA subjects to judicial review a "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. In assessing finality and ripeness, the Supreme Court has stressed that finality is to be interpreted in a "flexible" and "pragmatic" way. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149-50 (1967). The Court must consider "both the fitness of the issue for judicial decision and the hardship to the parties of withholding court consideration." *Id.* "Under this 'practical common sense' approach, the ripeness inquiry does not turn on nice legal distinctions." *Ciba-Geigy Corp. v. U.S. EPA*, 801 F.2d 430, 434 (D.C. Cir. 1986). "Close questions of ripeness are appropriately guided by the presumption of reviewability, especially [as is the case here] when the affected party faces the dilemma of choosing between disadvantageous compliance or risking imposition of serious penalties." *Id.*

In *Abbott Laboratories*, the Supreme Court set forth five factors to be analyzed: First, does the agency action represent the definitive position of the agency? Second, does the agency pronouncement have the status of law, so that immediate compliance is expected? Third, does the agency action have an immediate impact on the daily operations of the plaintiff? Fourth, is the dispute over a pure question of law? Finally, will a pre-enforcement challenge speed enforcement of the relevant act? *Id.* at 149-53. Further, "[t]he mere possibility that an agency might reconsider in light of 'informal discussion' and invited contentions of inaccuracy does not suffice to make an otherwise final agency action nonfinal."[3] Courts look to whether the agency's position is "definitive" and whether it has a "direct and immediate effect on [plaintiff's] day-to-day business."

---

[3] *Sackett v. EPA*, 566 U.S. 120, 127 (2012) (factually conclusory EPA compliance order limiting property owners' ability to develop their land and threatening penalties for noncompliance constituted a final agency action subject to review); *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (opinion issued by the Fish and Wildlife Service amounted to a final agency action due to its coercive effects, despite contention that such opinions merely served an advisory function).

*Ciba-Geigy Corp.*, 801 F.2d at 436 (citations omitted). "The term 'agency action' encompasses an agency's interpretation of law. It is therefore the finality of that interpretative position which is relevant for purposes of determining the ripeness of the statutory question." *Id.* at 435 (citations omitted). These indicia of finality ordinarily control and "once the agency publicly articulates an unequivocal position [on the law] and expects regulated entities to alter their primary conduct to conform to that position, the agency has voluntarily relinquished the benefit of postponed judicial review." *Id.* Finally, and especially relevant here, "parties need not await enforcement proceedings before challenging final agency action where such proceedings carry the risk of 'serious criminal and civil penalties.'" *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 600 (2016).

Applying the *Abbott Laboratories* factors and other law stated above, this case is clearly ripe. Regarding the first and second factors, the ATF's statements in the C&D Order and subsequent statements to Plaintiff and others represent ATF's definitive legal position with respect to what it (incorrectly) thinks the GCA covers, which incorrect position is also embodied in the new Final Rule set to take effect in August. It matters not that the C&D Order and other statements might arguably be considered informal. *E.g., Barrick Goldstrike Mines v. Browner*, 215 F.3d 45, 46 (D.C. Cir. 2000) (Website posting sufficient for standing since agency cannot avoid judicial review by labeling an action "informal"); *Ciba-Geigy Corp.*, 801 F.2d at 437 (letter from agency official stating agency's position sufficient for standing).[4] On the third factor, the ATF's action has a direct and clear impact on Plaintiff's business as set forth in the Verified Complaint and n. 1 above. Fourth, the instant dispute boils down to a pure question of law – the scope of the GCA. Lastly, a "pre-enforcement" challenge will provide much needed clarity to the parties by providing

---

[4] At the May 25, 2022 oral argument, the Court asked several times if a statement on an agency website could give rise to standing or make a case ripe for standing purposes (Tr. 22-23, 26, 30-31), the decision of the *Browner* court indicates that the clear answer to this question is "yes."

3

a definitive interpretation of the scope of the GCA and its application to firearm parts.

The unacceptable alternatives provided to JSD in light of the ATF's conduct and actions are substantively identical to those posed by the agency action deemed final by the Supreme Court in *Hawkes* and for which standing was found because the alternatives were inadequate compared to immediate judicial review: "either discharge fill material without a permit, risking an EPA enforcement action during which they can argue that no permit was required, or apply for a permit and seek judicial review if dissatisfied with the results." 578 U.S. at 600. Should JSD Supply continue business as usual, it risks ATF enforcement action for the sale of unregulated firearm parts which ATF now maintains requires an FFL. Simply put, the actions and positions of the ATF "carr[y] the risk of 'serious criminal and civil penalties'" under the GCA. *Id*. As the Supreme Court held in *Hawkes,* JSD need not wait for ATF to "drop the hammer" before it has its day in court. *Id*.

Consistent with *Hawkes,* the threat of "future enforcement actions" to Plaintiff here is not "speculative," as the government argues. *See* Tr. at 14 ll.14-18. Rather, as Plaintiffs have noted, ATF's purported rescission of the C&D Order was in name only, and in no way has changed the threat to Plaintiff caused by announcement of ATF's new policy shift to regulate firearm parts and 80% receivers, when sold by the same company, which Plaintiff submits is in contravention of the GCA and the Constitution. In fact, ATF's cease and desist letter to KM Tactical (issued nine days after the C&D Order to Plaintiff) alleged that "ATF is conducting a criminal investigation into these sales" and issued an evidence preservation order. *See* Doc. 19-1, Ex. 4. Likewise, government counsel at oral argument openly accused Plaintiff of having committed innumerable federal felony crimes by participating in a "heavily regulated industry" without a "federal firearms license that would allow it to sell any and all of these products…." Tr. at 35 l.24 – 36 l.9. The government's

4

brief in opposition claims that the Court should "*wait to see if there are further factual developments*" (*id*. at 14), yet that is exactly what the Supreme Court has held is <u>*not*</u> required, explaining that "a plaintiff need not 'first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute.'" *Steffel v. Thompson*, 415 U.S. 452, 459 (1974); *Hawkes, supra*. Plaintiff is faced with a real, concrete Hobson's choice, such that Supreme Court and Third Circuit law dictate a finding of ripeness. *Compare Solar Turbines*, 879 F.2d at 1082 (no Hobson's choice because, *inter alia*, "no civil or criminal liabilities accrue from the violation of the order"). JSD "need not" wait for ATF to "'drop the hammer' in order to have [its'] day in court." *Hawkes*, 578 U.S. at 600. Clearly, JSD's claim is ripe.

### C. ATF's Actions Have the Same Legal Effect as an ATF Classification Letter.

At argument, the Court asked if ATF's "interpretation was set forth in a different forum," such as by a "statement on the ATF's website" or "a tweet" or where "an ATF officer made a statement before Congress," whether this "would confer constitutional standing…." Tr. at 26 ll. 10-13, at 22 l.20 – 23 l.3. In response, counsel responded in the affirmative that an ATF "website" statement, an "industry circular," or an "open letter" would clearly give rise to Article III standing. Tr. at 26 ll.14-22.[5] Likewise, counsel analogized the C&D Order (as well as the language in the withdrawal letter) to an ATF "classification determination," noting that both types of letters from ATF are premised on (i) the agency's *examination* of the products in question, and (ii) a resulting *determination* as to their legal status. Tr. at 31 l.16 – 32 l.2. Indeed, whereas a person *voluntarily* submits for a classification letter, a C&D Order or other written statement by ATF is essentially the same process through *involuntary* means, where ATF has examined the products on its own

---

[5] *Browner*, 215 F.3d at 46 (Website posting of "guidance" sufficient); *S.F. Herring Ass'n v. U.S. DOI*, 946 F.3d 564, 567-68 (9th Cir. 2019) (Park Service's "in-water" enforcement orders - backed by earlier formal Dept. of Interior notices and other communication - sufficient for standing).

5

volition.[6] *See* Doc. 17 ("Opp. Br.") at 2 ("a manufacturer or dealer *is not legally required to seek an agency determination* whether its product constitutes a 'firearm') (emphasis added).

In fact, the government's opposition brief explains that, very much like the C&D Order issued to Plaintiff, "[a] classification letter sets forth the agency's official position concerning the status of [products] under Federal firearms laws." Opp.Br. at 3 (citations omitted). The government further concedes that "[a] letter recipient may seek reconsideration of the classification from the agency, and may also seek judicial review of the classification." *Id*. ATF's position in this case is more firmly established than the position taken by any classification letter, as the agency has made conclusive (albeit incorrect) *findings* as to the legal status of Plaintiff's products, has made explicit *demands* of Plaintiff's operations, has *rejected* Plaintiff's attempts at dialogue, and has *refused* all opportunities to reverse or recant its position.

D. **ATF's Revocation of its Classification Letters to Plaintiff Provides Standing.**

What is more, *ATF has issued favorable classification letters to Plaintiff itself*, with respect to some of the products that Plaintiff currently sells. *See, e.g.,* Compl. Exhibit 8 (Nov. 21, 2017 ATF letter determining that Plaintiff's P320-style 80% frame submission "has not reached a point in the manufacturing process that it would be classified as a 'firearm'"). However, contrary to that determination, ATF's C&D Order, as well as the agency's other statements, demand that Plaintiff "must … [c]ease and desist the sale of the full set of component parts necessary to produce or readily converted [sic] into a functioning firearm" – a direction which obviously includes halting the sale of Plaintiff's P320-style 80% frame along with other unregulated firearm parts, particularly since the ATF asserts that selling unregulated parts in multiple transactions is illegal

---

[6] *See Akins v. United States*, No. 8:08-cv-988-T-26TGW, 2008 U.S. Dist. LEXIS 134550, at *6 (M.D. Fla. Sep. 23, 2008) ("ATF obtained a retail-model device on October 6, 2006, and forwarded it to FTB on October 11, 2006.").

6

as a "sale of the full set of component parts". *See* Doc. 1, Ex. 1 at 2.

In other words, ATF's C&D Order and its other statements *reverse the agency's prior favorable classification letter to Plaintiff*, with respect to its P320-style 80% frame. Indeed, ATF's letter rescinding the C&D Order specifically instructs that "[a]ny questions about whether any particular product or products would be considered a 'firearm' for purposes of the GCA and its implementing regulations may be submitted to ATF for classification." *Id*. at 1. Of course, there would be no need for Plaintiff to *re-submit* its P320-style frame to ATF for classification, unless ATF's classification of that product had changed.[7] Indeed, the Final Rule – which ATF is trying to implement several months early – explicitly states that "prior ATF classifications of a 'partially complete … frame or receiver' will not be grandfathered upon issuance of this final rule," and "ATF will reconsider those firearm classifications, and any prior classifications of such items or parts kits would need to be resubmitted…." 87 *Fed. Reg*. 24673. Thus, in both the C&D Order, its other statements, and the Final Rule, *ATF has revoked its favorable classification determinations issued to Plaintiff*. There is no colorable argument that Plaintiff does not have standing to challenge such a revocation.[8]

### E. Plaintiff Has Standing to Challenge Premature Enforcement of the Final Rule.

Even if Plaintiff did not have independent standing to challenge the C&D Order issued by ATF or ATF's other statements and conduct, including its revocation of prior favorable classification

---

[7] *See* Tr. at 24 l.15 25 l.5 ("I don't agree [with the government] that a cease and desist letter has no legal effect … [it] announces a formal agency position … applies that legal position to the Plaintiff in a real and concrete way [and] orders the Plaintiff to take certain specific actions.").

[8] *See Akins v. United States*, 312 Fed. Appx. 197 (11th Cir. 2009) (ruling on a challenge where "[t]he Bureau classified the Accelerator as a machinegun [and] notified Akins that its previous letters were 'overruled'…."); *Freedom Ordnance Mfg. v. Brandon*, 2018 U.S. Dist. LEXIS 243000 (S.D.Ind. 2018) (describing ATF "[c]lassification letters" as "informal adjudications" which it describes "as a residual catch-all for agency actions that are not a product of rulemaking or on the record hearings.").

letters to Plaintiff, that is far from the only agency action that Plaintiff has challenged in this case. Rather, Plaintiff's Complaint and Motion repeatedly and explicitly challenge the agency's new underlying policies, including those adopted by the agency in ATF Final Rule 2021R-05F.[9] There is simply no question that the Final Rule, issued after the formal notice and comment rulemaking process, constitutes final agency action (5 U.S.C. 551(13)), and one which harms Plaintiff in real and concrete ways.[10] Since the Final Rule is, by definition, a "final" agency action, Plaintiff (one of the main targets of the Final Rule's political agenda to eliminate so-called "ghost guns") quite obviously has standing to challenge its regulatory enactments, particularly as applied to Plaintiff several months before the new rule is even set to take effect.[11]

---

[9] *See, e.g.*, Compl. ¶60 n.13 ("ATF's C&D Order to Plaintiff, and actions in the upcoming Final Rule 2021R-05F, thus represent a dramatic change in longstanding agency policy, without acknowledging the shift, much less providing a reasoned explanation for it."); *see also* Motion (Doc. 2) at 1; Memorandum in Support (Doc. 3) at 2; Proposed Order (Doc. 4) at 2.

[10] Indeed, the Final Rule will revoke all prior ATF classification letters on 80% frames and receivers (*i.e.*, criminalizing Plaintiff's business model). 87 *Fed. Reg.* 24673. The Final Rule will define a "firearm" to "include a weapon parts kit," such as what ATF accuses Plaintiff of selling without a license, even though each part of such a kit is not independently regulated. *Id*. at 24735. The Final Rule attempts to define the term "readily" as it appears in 18 U.S.C. 921(a)(3)(A), and (improperly) apply it to 80% frames and receivers and "weapon parts kits." *Id*. at 24653.

[11] The government apparently disagrees. *See* Tr. at 35 ll.8-11. The government's position is contrary to the law. *See Ciba-Geigy Corp,* 801 F.2d 430 (**reversing** a district court's conclusion that an EPA letter to "simazine registrants" notifying that EPA was changing "labeling requirements" "is itself devoid of legal effect," **applying** the *Abbott Laboratories* test for ripeness, and **concluding** that the case was **fit** for judicial review because "the principal issue presented to the District Court was one of statutory interpretation, and that the case was **ripe** because the EPA letter (i) "unequivocally stated EPA's position," (ii) "gave no indication that it was subject to further agency consideration or possible modification," (iii) a "follow-up letter from EPA was equally definitive, reiterating 'the Agency position' … on pain of civil and criminal penalties" which (iv) "provided [the agency's] final word on the matter 'short of an enforcement action,'" all of which (v) "has a significant 'legal effect' on Ciba-Geigy" because it "has complied with EPA's [demands] and will presumably continue to do so unless a court holds" otherwise, including "a substantial drop (estimated at 50 percent) in sales" along with "market share and loss of goodwill," and "the Company's only alternative … would be to run the risk of serious civil and criminal penalties for unlawful distribution…."); *see also Solar Turbines,* 879 F.2d at 1076-77, 1082 (3d. Cir. 1989) (finding the district court did not have jurisdiction to consider "an administrative order" which "'require[ed] the immediate cessation of construction and/or operation of the gas turbine

To be sure, the government continues to argue (unconvincingly) that the C&D Order and other statements to Plaintiff have *nothing at all to do* with the Final Rule. *See* Tr. 17 ll. 11-15; *see also* Tr. 17 l.25 – 18 l.4; Opp. Br. at 15-26. Of course, simply claiming that something is so does not make it so. On the contrary, as Plaintiff has explained: (1) The C&D Order *uses the same language* as the Final Rule (*see* Compl. ¶¶ 163-65); (2) ATF in this case *advances the same (never before announced) legal theory* as the Final Rule (*see* Compl. ¶¶ 161, 163, 169); (3) the Final Rule is the *first time* that ATF has purported to question or revoke existing classification letters on 80% frames and receivers and firearm parts kits (*see* Compl. ¶¶ 76-112; 87 *Fed. Reg.* 24673); (4) ATF's lawyers specifically pointed Plaintiff to the Final Rule in order to better understand the position taken by ATF in the C&D Order (*see* Doc. 1. ¶185; *Id.*, Ex. 2 at 3-4); and (5) the government's opposition brief uses a footnote taken from the Final Rule (*compare* Doc. 17 at 2 n.1 *with* 87 *Fed. Reg.* 24662 n.44 (*and* the Notice of Proposed Rulemaking, 86 *Fed. Reg.* 27727 n.40).

Contrary to the government's contention, it is quite obvious that ATF's C&D Order and other statements seek to enforce the Final Rule prematurely against Plaintiff. Plaintiff clearly has standing to challenge enforcement of the Final Rule against it, most especially when that enforcement has occurred well in advance of the Final Rule's effective date.[12]

---

facility,'" *but only because* "the Clean Air Act expressly sets forth the procedural route and timing for judicial review" and "precludes pre-enforcement review of … [CAA] administrative orders" and because – unlike the instant case with JSD – the issue was not a pure question of law, was ripe for adjudication in another proceeding between the parties, and the plaintiff did not face a "Hobson's choice"). Contrary to the situation in *Solar Turbines*, this case presents a pure question of law, the GCA has no analog to the unique procedural scheme under the CAA and, unlike *Solar Turbines* where "no civil or criminal liabilities accrue from the violation of the order," there is a real threat of criminal prosecution from the ATF's position. **JSD indeed faces a Hobson's choice**.

[12] *See Arledge v. Holnam, Inc.*, 957 F. Supp. 822, 828 (M.D. La. 1996) ("… if a law attaches a new consequence to a certain event, it cannot be applied to those regulated events that occurred before the law's effective date.").

### F. Plaintiff Has Standing Despite ATF's Purported Rescission of its C&D Order.

At argument, this Court referenced the Third Circuit's recent decision in *Hartnett v. Pa. State Educ. Ass'n*, 963 F.3d 301 (3d Cir. 2020), as announcing the standard for when a case can become moot due to a party's voluntary cessation. Tr. at 11 l.23 – 12 l.6; *see also* Doc. 19-1, p. 3. In that case, citing Supreme Court precedent, Judge Bibas explained that a case can be mooted only if it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id*. at 306. As discussed in detail at Doc 19-1, p. 3-5, that standard cannot be met here.[13] Unlike *Harnett*, where everyone agreed the law could not be enforced, here ATF has actually "forcefully maintained" and threatened to enforce in the future its (incorrect) interpretation of the GCA. *Harnett,* 936 F.3d at 306. Indeed, as Plaintiff has explained, there is absolutely no indication that ATF has backed away from its wrongful actions in this case and, indeed, the agency "maintains that its conduct was lawful all along." *Hartnett* at 306. What's more, far from it being "reasonably [] expected" that ATF will not engage in the same behavior, the agency in fact *is currently engaging* in the same behavior underlying its C&D Order to Plaintiff.[14]

---

[13] At oral argument, Defense counsel twice misstated the voluntary cessation test asserting a characterization of *Hartnett* that improperly shifts the mootness burden from Defendants to prove that they *will not* relapse to Plaintiffs to show that they *will*. Tr. at 12 ll.14-15, at 12 l.24 – 13 l.3. On the contrary, "[t]he burden always lies on the party claiming mootness." *Hartnett* at 307; Tr. at 4 ll.12-15. *See Davis v. Wells Fargo*, 824 F.3d 333, 348 (3d Cir. 2016); *Solar Turbines* at 1078 (no mootness where, after challenge, "the EPA withdrew the rule, but continued to assert its authority" and "demonstrated its steadfast commitment to" its legal position.)

[14] At argument, the primary thrust of government counsel's argument appeared to be that, since ATF has nominally rescinded the C&D Order, Plaintiff no longer is seeking the proper relief. *See* Tr. at 8 ll.16-25; at 10 ll.10-12, ll.22-25; at 12 ll.17-20; at 13 ll.20-25; at 14 ll.4-10; at 19 ll.15-18; at 36 ll.18-19. Of course, Plaintiff's Complaint, Motion, and Proposed Order sought far more relief than merely against the C&D Order. However, even if the government were correct, it is an argument of form over substance, as Plaintiff would merely need to make minor amendments to its motion. Alternatively, if the Court believes that the case is moot or not ripe or that the Verified Complaint needs to be amended due to the recission of the C&D Order, Plaintiff respectfully requests that it be allowed leave to do so under Rule 15.

Dated:  June 1, 2022

Respectfully submitted,

By:     /s/ David J. Berardinelli
David J. Berardinelli
DEFOREST KOSCELNIK & BERARDINELLI
436 Seventh Ave., 30th Fl.
Pittsburgh, PA  15219
T:  412-227-3100
F:  412-227-3130
Email: berardinelli@deforestlawfirm.com

Robert J. Olson*
WILLIAM J. OLSON, P.C.
370 Maple Avenue West, Suite 4
Vienna, VA 22180-5615
T: (703) 356-5070
T: (540) 450-8777
F: (703) 356-5085
Email: wjo@mindspring.com
*Admitted Pro Hac Vice

Stephen D. Stamboulieh*
Stamboulieh Law, PLLC
P.O. Box 428
Olive Branch, MS  38654
(601) 852-3440
Email: stephen@sdslaw.us
MS Bar No. 102784
*Admitted Pro Hac Vice