IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| NOT AN LLC *doing business as* JSD SUPPLY,<br><br>     *Plaintiff,*<br><br>  v.<br><br>BUREAU OF ALCOHOL, TOBACCO, FIREARMS, and EXPLOSIVES, *et al*,<br><br>     *Defendants.* | Civil Action No. 2:22-cv-747<br><br>Hon. William S. Stickman IV |

## **MEMORANDUM OPINION**

WILLIAM S. STICKMAN IV, United States District Judge

  On May 9, 2022, Defendant Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") issued a cease and desist letter to Plaintiff Not an LLC, doing business as JSD Supply, ("Plaintiff" or "JSD"). That letter informed JSD that ATF believed products JSD was selling (individually and/or in combination) violated federal law and instructed JSD to cease doing so. JSD took exception to ATF's position with respect to both its interpretation of relevant federal law and its assessment of JSD's business. JSD filed suit and now seeks a preliminary injunction barring any action by ATF on, or arising out of, the cease and desist letter. But after this case was filed, ATF issued a rescission of its cease and desist letter. JSD, however, believes that the rescission rings hollow because it reiterates the same interpretation of the governing law that formed the underpinning of the original cease and desist letter. JSD, therefore, maintains that a preliminary injunction is still warranted.

  The Court is unable to grant the relief that JSD seeks. A preliminary injunction is an extraordinary remedy that may only be issued where a plaintiff can demonstrate a reasonable

likelihood of success on the merits of its claims. It goes without saying that there cannot be a reasonable likelihood of success on the merits if threshold statutory and constitutional doctrines preclude a court from reaching the substantive merits of the claims. That is what happened here. The Court cannot examine and adjudicate the substance of JSD's claims because they are not yet ripe and ATF's actions are not final agency action within the meaning of the Administrative Procedure Act ("APA"). The Court will deny the request for a preliminary injunction.

## I. FACTS AND PROCEDURAL HISTORY

JSD is primarily a retailer of firearm-related parts, tools, and accessories, including products commonly called 80% frames or receivers. (ECF No. 1, ¶ 19). JSD contends that none of the products it sells are classified as firearms under the Gun Control Act, 18 U.S.C. § 921(a)(3), and associated regulations. (*Id.* ¶ 21). Indeed, JSD pleads (and attaches various supporting exhibits showing) that ATF has expressly taken the position that every product that it sells is not covered by the GCA and is, therefore, completely unregulated. (*Id.* ¶¶ 22–23). Moreover, JSD pleads (and, again, attaches supporting exhibits showing) that ATF has historically taken the position that not only are individual sales of its products unregulated, but that combination sales of these individually unregulated products are permissible. (*Id.* ¶ 24).

On May 12, 2022, JSD received a letter from ATF (dated May 9, 2022) that stated as follows:

> This letter is in regard to the products sold by your company, JSD Supply, which are generally described on your website, www.jsdsupply.com, as "JSD 80% Lower Receivers, Jigs, and Gun Parts Kits." The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) is aware that JSD Supply is selling and transferring all the components necessary to produce a fully functional firearm to a single customer in one or multiple transactions.
>
> The Gun Control Act of 1968 ("GCA"), in relevant part, defines the term "firearm" as "any weapon…which will, is designed to, or may readily be converted to expel a projectile by the action of an explosive…[or]…the frame or

receiver of any such weapon." 18 U.S.C. § 921(a)(3). ATF has held that kits which include all components necessary to produce a functional firearm, including the jig or template used to finish the unfinished frame or receiver, the slide assembly, and the necessary components to complete the frame or receiver are themselves properly classified as "firearms" under the GCA. Specifically, these kits are a weapon that may readily be converted to expel a projectile by the action of an explosive. These kits are, therefore, firearms under the GCA and have always been firearms pursuant to statute. This is and has been true notwithstanding the recently announced regulations and definitions under Final Rule 2021R-05F.

Accordingly, those engaged in the business of selling these complete kits, as your company does, are in fact engaged in the business of dealing firearms. Further, selling the necessary components to produce a functional firearm to the same person through multiple purchases or structured transactions at different times instead of a single sale is equivalent to selling the complete kit to the customer. That is, the complete set of component parts necessary to create a firearm need not be packaged or sold in a single container or a single transaction in order to be considered a firearm. These piecemeal sales circumvent the requirements of the GCA and are unlawful.

To lawfully engage in the business of dealing firearms, a person must first obtain a Federal Firearms License (FFL). 18 U.S.C. § 923(a). JSD Supply does not currently possess, nor was it ever issued, an FFL that would authorize JSD Supply to engage in the business of dealing firearms. Additionally, JSD Supply does not maintain records as required by the GCA, nor does it subject its customers to undergo an NICS background check, both of which actions are necessary for the lawful sale of firearms. Therefore, JSD Supply must take the following actions:

1. **Cease and desist the sale of firearms without a license;**

2. **Cease and desist the sale of the full set of component parts necessary to produce or readily converted into a functioning firearm, whether in a single transaction or in multiple structured transactions;**

3. **Immediately and fully comply with and abide by all laws and regulations governing the same of firearms, frames, and receivers.**

For public safety reasons, your cooperation in this matter is essential.

(ECF No. 1-1) (emphasis in original).

Counsel for JSD contacted ATF attempting to clarify which products and/or product combinations were referenced in the letter. (ECF No. 1-2). After not receiving a satisfactory response from ATF, JSD filed the Complaint in this action on May 19, 2022. (ECF No. 1). It raises five causes of action:

- Count 1: Violation of APA, 5 U.S.C. § 706(2)(A) – Arbitrary, Capricious, Abuse of Discretion, Not in Accordance with Law;

- Count 2: Violation of APA 5 U.S.C. § 706(2)(C) – In Excess of Statutory Jurisdiction or Authority;

- Count 3: Violation of Second Amendment – Right to Keep and Bear Arms;

- Count 4: Violation of Fifth Amendment – Due Process Vagueness;

- Count 5: Declaratory Judgment.

(ECF No. 1, ¶¶ 218–60).[1] On May 20, 2022, JSD filed an Emergency Motion for Temporary Restraining Order and/or Preliminary Injunction. (ECF No. 2). JSD seeks an order (1) enjoining ATF "from enforcing, pursuing, or otherwise taking any action against Plaintiff with respect to ATF's C&D Order dated May 9, 2022;" (2) enjoining ATF from "enforcing against Plaintiff the claims and demands made in ATF's C&D Order of May 9, 2022;" and (3) enjoining ATF "from enforcing the Final Rule (2021R-05F) ahead of its date of implementation of August 24, 2022." (ECF No. 2-1). The Court declined to issue an emergency *ex parte* temporary restraining order but promptly scheduled a hearing on the request for preliminary injunctive relief for May 25, 2022. (ECF No. 9).

---

[1] After careful review of the Complaint, the Court finds that each of these claims is framed with reference to the cease and desist letter. Thus, the challenged agency action—as pleaded by JSD as master of its Complaint—is ATF's May 9, 2022, cease and desist letter, not ATF's Final Rule 2021R-05F (effective August 24, 2022), which allegedly changes ATF's position with respect to what constitutes a firearm under federal law. *See* Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24652 (Apr. 26, 2022).

On May 24, 2022, the Court learned that, four days earlier, ATF had issued a rescission of its May 9, 2022, cease and desist letter. The May 20, 2022, rescission letter stated:

> The cease-and-desist letter dated May 9, 2022, and issued to your client, JSD Supply, is hereby rescinded.
>
> Please be aware that the Bureau of Alcohol, Tobacco, Firearms and Explosives' (ATF's) longstanding position that firearm kits that are designed to or may readily be converted to, expel a projectile by the action of an explosive are firearms as defined by the Gun Control Act, 18 U.S.C. § 921(a)(3)(A), remains in effect. *See In the Matter of the Search of Polymer 80, Inc.*, 3:20-mj-123 WGL (D. Nev. Dec. 9, 2020). Any questions about whether any particular product or products would be considered a "firearm" for purposes of the GCA and its implementing regulations may be submitted to ATF for classification.

(ECF No. 17-1). The Court converted the May 25, 2022, hearing to oral argument on the issue of whether ATF's rescission letter rendered JSD's request for preliminary injunctive relief moot. (ECF No. 21). The Court entertained via videoconference robust argument that addressed not only the issue of mootness, but also the issues of standing, ripeness, and the nature of ATF cease and desist letters.

Following oral argument, the parties submitted supplemental briefing with respect to the threshold question of whether the Court is able to grant the relief JSD seeks. JSD argues that it has Article III standing to challenge the lawfulness of ATF's cease and desist letter; that is claims are ripe; that its APA claims constitute final agency action, and that ATF's rescission of the cease and desist letter does not moot the controversy pursuant to the voluntary cessation doctrine. (ECF No. 23). ATF, for its part, challenges each of those contentions. (ECF No. 24).

## II. STANDARD OF REVIEW

The grant or denial of a preliminary injunction is within the sound discretion of a district court. *See Reilly v. City of Harrisburg*, 858 F.3d 173, 178–79 (3d Cir. 2017) ("District courts have the freedom to fashion preliminary equitable relief so long as they do so by 'exercising their

sound discretion.'" (citation omitted)). The primary purpose of preliminary injunctive relief is "maintenance of the status quo until a decision on the merits of a case is rendered." *Acierno v. New Castle County*, 40 F.3d 645, 647 (3d Cir. 1994). The "status quo" refers to "the last, peaceable, noncontested status of the parties." *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004).

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008). Rather, such relief "should be granted only in limited circumstances." *Kos Pharms.*, 369 F.3d at 708 (citation omitted). A moving party "must establish entitlement to relief by clear evidence." *Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 526 (3d Cir. 2018). Specifically, the movant must demonstrate:

> (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief.

*Kos Pharms.*, 369 F.3d at 708; *see also Winter*, 555 U.S. at 20. The first two factors are "the most critical," and the moving party bears the burden of making the requisite showings. *Reilly*, 858 F.3d at 176, 179 (citations omitted). Once those "gateway factors" are met, a court should "consider[] the remaining two factors" and then "determine[] in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.* at 179.

In reaching its decision on a request for injunctive relief, a district court sits as both the trier of fact and the arbiter of legal disputes. A court must, therefore, make "findings of fact and conclusions of law upon the granting or refusing of a preliminary injunction." *Bradley v. Pittsburgh Bd. of Educ.*, 910 F.2d 1172, 1178 (3d Cir. 1990) (citing Fed. R. Civ. P. 52(a)(2)). This "mandatory" requirement of Rule 52(a)(2) must be met "even when there has been no evidentiary hearing on the motion." *Id.* Nevertheless, at the preliminary injunction stage,

"procedures [] are less formal and evidence [] is less complete than in a trial on the merits." *Kos Pharms.*, 369 F.3d at 718; *see also AT&T Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994) ("[T]he grant or denial of a preliminary injunction is almost always based on an abbreviated set of facts, requiring a delicate balancing [that] is the responsibility of the district judge." (citations omitted)). Accordingly, a court "may rely on affidavits and hearsay materials which would not be admissible evidence." *Kos Pharms.*, 369 F.3d at 718 (quoting in parenthetical *Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*, 51 F.3d 982, 985 (11th Cir. 1995)). But the weight given to such materials will "vary greatly depending on the facts and circumstances of a given case." *Id.* at 719. A court is also tasked with assessing the credibility of witness testimony and may base the decision to grant or deny a preliminary injunction on credibility determinations. *See, e.g., Hudson Glob. Res. Holdings, Inc. v. Hill*, 2007 WL 1545678, at *8 (W.D. Pa. May 25, 2007).

## III. ANALYSIS

In order to obtain the requested preliminary injunctive relief, JSD must first prove that "it can win on the merits." *Reilly*, 858 F.3d at 179. At this preliminary stage, JSD need not make "a more-likely-than-not showing of success on the merits." *Id.* at 179 n.3. Instead, it must "show a *likelihood* of success on the merits (that is, a reasonable chance, or probability, of winning)." *Singer Mgmt. Consultants v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011) (en banc). This "requires a showing significantly better than negligible but not necessarily more likely than not." *Reilly*, 858 F.3d at 179. After a careful review of JSD's Complaint and the arguments of the parties, the Court holds that JSD has not made this showing. As explained below, the Court holds that it would not be able to reach the substantive merits of JSD's claims for two separate, but conceptually related, reasons. First, JSD will be unlikely to prevail on its APA claims

7

(Counts I and II) because the cease and desist letter does not constitute final agency action—a necessary statutory prerequisite to judicial review. Second, JSD is not reasonably likely to prevail on its remaining claims (Counts III, IV, and V) because they are not ripe for adjudication.[2]

### A. APA Claims (Counts I and II)—Final Agency Action

Because JSD presents its first two claims under the APA, and because of the self-contained nature of the analysis, the Court will first address whether JSD has satisfied the statutory prerequisites to asserting its APA claims. The Court holds that it has not. Specifically, JSD has not established that ATF's cease and desist letter constitutes final agency action. Absent final agency action, JSD's APA claims are not subject to judicial review. As such, Counts I and II of the Complaint do not stand a reasonable likelihood of success on the merits.

The APA "embodies [a] basic presumption of judicial review to one 'suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute.'" *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 140 (1967) (quoting 5 U.S.C. § 702); *see also Sackett v. EPA*, 566 U.S. 120, 130 (2012) ("The APA's presumption of judicial review is a repudiation of the principle that efficiency of regulation conquers all."). However, there are limits to that presumption. Judicial review is not available under the APA where "statutes preclude judicial review" or "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a). Moreover, the APA only provides a cause of action with respect to "[a]gency action made reviewable by statute and final agency action for which there is no other

---

[2] The parties, both at oral argument and in their supplemental briefs, gave substantial attention to whether JSD has Article III standing and whether ATF's rescission of its cease and desist letter rendered the controversy moot. However, the Court need not address standing or mootness. Rather, as explained herein, even if JSD has standing and even if the rescission letter had never issued (or otherwise does not moot the issues), the ATF cease and desist letter does not satisfy the statutory requirement of final agency action necessary to maintain JSD's APA claims. Further, it does not give rise to a ripe dispute for any of JSD's remaining claims.

adequate remedy in a court." *Id.* § 704. The term "agency action" includes "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Id.* § 551(13); *see also id.* § 701(b)(2).

To determine whether an agency action is "final," courts look to a number of "hallmarks of APA finality." *Sackett*, 566 U.S. at 126. These hallmarks include: (1) whether the action determined rights or obligations; (2) whether legal consequences flow from the action; and (3) whether the action marks the consummation of the agency's decision making process. *See id.* at 126–27 (citing *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). Other relevant considerations—which overlap somewhat with the hallmarks identified above—include: (4) whether the action was a definitive statement of the agency's position; and (5) whether the action had a direct and immediate effect on the day-to-day business of the complaining parties. *See FTC v. Standard Oil Co.*, 449 U.S. 232, 239 (1980) (citing *Abbott Lab'ys*, 387 U.S. at 151–52).

The United States Court of Appeals for the Third Circuit explored these factors in a context similar to the case at bar in *Solar Turbines, Inc. v. Seif*, 879 F.2d 1073 (3d Cir. 1989). In that case, the plaintiff received a state permit to build a gas turbine electric plant. After construction began, the Environmental Protection Agency ("EPA") issued an administrative order asserting that the plant did not comply with provisions of the Clean Air Act. *See* 42 U.S.C. § 7477. The order "requir[ed] the immediate cessation of construction and/or operation of the gas turbine facility." *Solar Turbines*, 879 F.2d at 1076 (citation omitted).

Claiming that the EPA's interpretation of the situation was mistaken, the plaintiff sought and obtained a temporary restraining order barring enforcement of the order. However, the court later granted the EPA's motion to dismiss and vacated the injunction, holding that, under the applicable statutory provisions, the EPA's action could only be reviewed in the Third Circuit.

The plaintiff then filed a petition for review in the Third Circuit. The EPA withdrew its administrative order and filed an action in the district court to enjoin further construction on the plant pending appellate review. Ultimately, the Third Circuit consolidated the parties' appeals from the district court and the petition for review. *Id.* at 1076.

The Third Circuit held that it could not reach the merits of the parties' dispute because there was not final agency action, which was a necessary prerequisite under the Clean Air Act. It did not focus on whether the administrative order constituted 'agency action.' Rather, it dedicated its analysis to whether the action was 'final.' Critical to the present case, the Third Circuit explained that "[t]he Supreme Court has interpreted the phrase 'any other final action' [in the Clean Air Act] to incorporate the finality requirement of the Administrative Procedure Act." *Id.* at 1079 (citing *Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 586 (1980)).

In determining whether the EPA's administrative order constituted final agency action, the court examined the nature of the order itself. It observed:

> The Administrative Order in this case sets forth what are denominated as "Findings of Fact," "Conclusions of Law," and an "Order." Such characterizations are ordinarily made by an agency or court following a hearing. There was no such hearing or adversarial factfinding process in this case. Thus, notwithstanding the headings, the "Findings of Fact" and "Conclusions of Law" merely state EPA's position and are best analogized to a complaint. They allege the EPA's position with respect to the relevant facts, the crux of the dispute, the procedural sequence, and the EPA's legal position.
>
> Although the language of the "Order" section "ordered" Solar Turbines to cease construction and operation of the facility immediately, and the cover letter accompanying the administrative order stated that "[f]ailure to comply with this Order could subject your firm to civil and criminal liabilities pursuant to the Clean Air Act," all parties agree that the administrative order is not self-executing. The EPA argues that because violation of the administrative order in itself effects no legal or relevant practical consequences, and such an "Order" requires court action to enforce, it is not "final action" within the meaning of section 307(b).

*Id.* at 1079–80 (internal citation omitted).

>Citing the Supreme Court's decision in *Abbott Lab'ys*, the Third Circuit explained:
>
>>The factors to be considered in assessing finality are: First, does the agency action represent the definitive position of the agency? Second, does the agency pronouncement have the status of law, so that immediate compliance is expected? Third, does the agency action have immediate impact on the daily operations of the plaintiff? Fourth, is the dispute over a pure question of law, without the need for factual development? Finally, will a pre-enforcement challenge speed enforcement of the relevant act?

*Id.* at 1080. Applying those factors, the Third Circuit concluded that "the determinative factor on finality in this case is that the administrative order has no operative effect on Solar Turbines." *Id.* at 1080–81. Indeed:

>Even though the wording of the administrative order is in the imperative and directs immediate compliance with its command to stop construction or operation of the cogeneration facility, and even though the accompanying letter seems to threaten civil and criminal liability upon noncompliance, ***no civil or criminal liabilities accrue from the violation of the order***.

*Id.* at 1081 (emphasis added). Because the administrative order did not constitute final agency action, the Third Circuit held that the plaintiff could not maintain suit under the APA.[3] *Id.* at 1082.

The cease and desist letter in this case does not constitute final agency action as required to maintain a claim under the APA. As the Third Circuit observed with respect to the EPA administrative order in *Solar Turbines*, the ATF cease and desist letter does not determine rights or obligations and otherwise has no direct legal consequences, either civil or criminal.

---

[3] Subsequent to the Third Circuit's decision in *Solar Turbines*, the Supreme Court held in *Sackett v. EPA*, 566 U.S. 120 (2012), that an administrative compliance order issued by the EPA pursuant to the Clean Water Act, *see* 33 U.S.C. § 1319, constituted final agency action under the APA. *Sackett*, however, did not abrogate *Solar Turbines*, as the two cases are legally and factually distinct. In *Solar Turbines*, the plaintiff was "not compelled to obey the order at the risk of sanctions and [did] not face severe hardship as a result of the order." 879 F.2d at 1082. That was so because, pursuant to the Clean Air Act, "no civil or criminal liabilities accrue from the violation of [an] order." *Id.* at 1081; *see also* 42 U.S.C. § 7477. Conversely, in *Sackett*, the plaintiffs were subject to up to $75,000 in civil penalties per day for violating a compliance order issued under the Clean Water Act. 566 U.S. at 123 & n.1; *see also* 33 U.S.C. § 1319(d).

11

Moreover, like in *Solar Turbines*, "[e]ven though the wording of the [cease and desist letter] is in the imperative and directs immediate compliance with its command . . ., and even though the accompanying letter seems to threaten civil and criminal liability upon noncompliance, no civil or criminal liabilities accrue from violation of the order." 879 F.2d at 1081.

The "only apparent function" of an ATF cease and desist letter is, as in *Solar Turbines*, "to serve as a vehicle by which [ATF] can notify a party that it believes the requirements of [the Gun Control Act] are being violated." *Id.* During oral argument, ATF, through counsel, conceded that—even before its rescission—the cease and desist letter had no independent legal effect:

> The nature of the Cease and Desist Orders is that they are not anything with a -- ATF is not required to issue or send any Cease and Desist Letters, and the Cease and Desist Letters are not a prerequisite to the ATF taking any action.
>
> If the ATF as a federal law enforcement agency has probable cause to believe that a legal violation has occurred, it does not have to send out a Cease and Desist before taking any other action.
>
> The purpose of these is to -- in situations where it comes to ATF's attention that it appears that someone without a federal firearms license is selling firearms, to put them on notice of -- to essentially remind and restate what the applicable law is and to put notice of that essentially as kind of a curt [sic] precedent.
>
> **But it doesn't give ATF any new rights or, again, it's not a requirement, and it doesn't impose any new obligations on the recipient of the letter. There's no separate legal violation or cause of action that ATF can bring for failure to comply with the Cease and Desist Letter because it doesn't have any legal effect. Its purpose is one of notice and one of restatement and reminder of what the law is**.

May 25, 2022, Oral Argument Transcript at pp. 5–6 (emphasis added). ATF's cease and desist letter thus has no immediate legal impact upon JSD. There is no independent penalty, civil or criminal, for failure to comply. Nor does the cease and desist letter confer upon ATF more authority than it would have had vis-à-vis investigation and prosecution if the letter were never

12

issued. Without the letter, ATF could have, at any time, investigated JSD and referred the matter for prosecution. The issuance of the letter is not indicative of any final determination with respect to JSD's liability under any federal law, including the Gun Control Act.

In short, the cease and desist letter does not have any legally operative effect on JSD, its rights, or its liabilities. Again, it creates no rights, it imposes no liabilities, nor does it impose any independent risk of criminal and civil liability beyond the general provisions of the Gun Control Act and associated regulations. The cease and desist letter did not constitute final agency action. Therefore, JSD's claims under the APA do not have reasonable likelihood of success on the merits, as those claims are barred from the outset.

### B. Remaining Claims (Counts III, IV, and V)—Ripeness

Moving beyond JSD's claims under the APA, the Court must next determine whether JSD is reasonably likely to succeed on the merits of Count III (Second Amendment), Count IV (Fifth Amendment); and Count V (Declaratory Judgment). Before the Court may look to the substantive merit of these claims, it must determine whether they are properly subject to judicial review. The Court concludes that they are not. Specifically, the Court holds that JSD is not reasonably likely to succeed on the merits of these claims because they are not yet ripe for adjudication.

Ripeness is a "doctrine[] of justiciability" that "originate[s] in the case-or-controversy requirement of Article III." *Trump v. New York*, 141 S. Ct. 530, 535 (2020) (per curiam). The basic rationale of the ripeness doctrine "is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbott Lab'ys*, 387 U.S. at 148. It also guarantees that a dispute has "taken on fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on the adversaries, and some

useful purpose to be achieved in deciding them." *Wyatt v. Gov't of the V.I.*, 385 F.3d 801, 806 (3d Cir. 2004) (quoting *Pub. Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 244 (1952)). To ensure that claims are ripe for adjudication, a court must "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* at 149; *see also Texas v. United States*, 523 U.S. 296, 300–01 (1998). Issues are fit for judicial review, for example, if they are "purely legal" in nature. *Abbott Lab'ys*, 387 U.S. at 149. And hardship to the parties can be found where the challenged action "requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance." *Id.* at 153. But where claims rest upon "contingent future events that may not occur as anticipated, or indeed may not occur at all," they are not ripe for review. *Texas*, 523 U.S. at 300 (citation omitted); *see also Sherwin-Williams Co. v. County of Delaware*, 968 F.3d 264, 272 (3d Cir. 2020) ("Claims based merely upon assumed potential invasions of rights are not enough to warrant judicial intervention." (citation omitted)).

The Court's determination that JSD's constitutional claims are not yet ripe is guided by the Third Circuit's ripeness analysis in *Hooker Chemical Co. v. EPA*, 642 F.2d 48 (3d Cir. 1981). In that case, the EPA issued an order to plaintiff Hooker Chemical Co. ("Hooker") taking the position that it had violated regulations relating to the discharge of vinyl chloride and directing it "to take steps necessary to prevent further violations, and to comply with the provisions of 40 C.F.R. § 61.65(a), which prohibit vinyl chloride emission in nonemergency situations." *Hooker*, 642 F.2d at 49–50. Hooker disagreed with the EPA's interpretation of the regulation and its position that Hooker had committed a violation, and it filed a petition for review in the Third Circuit. After the petition was filed, the EPA sent Hooker a letter that notified it that "the above referenced order is hereby withdrawn." *Id.* at 50. The letter further stated:

> EPA has no intention to seek judicial relief against Hooker for possible violations of this Order prior to the time of its withdrawal. However, in no event should this withdrawal be construed to relieve Hooker of liability for violations of the underlying regulatory provisions set forth at 40 CFR § 61.65(a). In fact, it is EPA's continuing belief that Hooker has violated the requirements of 40 CFR §61.65(a). EPA will take appropriate enforcement measures necessary to remedy any such violations which have occurred at the referenced polyvinyl chloride plant.

*Id.* The EPA argued that the withdrawal of its order rendered the case moot. The Third Circuit, however, held that the EPA's withdrawal did not moot the case.[4] *Id.* at 52. Nonetheless, it determined that the case was not ripe. *Id.* ("Despite the fact that the action should not be dismissed as moot, we are persuaded that review of the agency action should be declined at this time.").

In determining that Hooker's challenge was not ripe for review, the Third Circuit first looked to "whether the controversy generated is essentially legal in nature or whether further factual amplification is necessary." *Id.* It found that the case would require substantial factual development. *Id.* at 53 ("This is not a case where the sole issue is the authority of the agency to promulgate a regulation and where further delineation of the circumstances is not needed to shape the issues."). The Third Circuit explained that whether Hooker had, in fact, violated the regulation cited by the EPA would require factual development. It held that the fact-intensive nature of the claims weighed against a determination of ripeness.

The Third Circuit next examined whether Hooker's claims challenged final agency action of the EPA. It held that it did not. Specifically, "[t]he informal demands in the transmittal letters impose no legal obligation to comply, and are not final agency action." *Id.* Moreover, "[i]n

---

[4] In rejecting the EPA's mootness argument, the Third Circuit explained that "[a] controversy still smolders when the defendant has voluntarily, but not necessarily permanently, ceased to engage in the allegedly wrongful conduct." *Id.* at 52.

15

view of the continuing investigation after withdrawal of the orders, review of the agency's conduct at this time would be an interference with an active administrative proceeding." *Id.*

Finally, the Third Circuit held that the EPA's actions did not inflict hardship upon Hooker. It reasoned that, "[a]lthough Hooker may be apprehensive of the policy stance adopted by EPA's enforcement division, the company is not required to take any action at this time beyond that required by 40 CFR § 61.65(a). *Id.* Moreover, the Third Circuit could not find that "the governmental activity 'by its continuing and brooding presence, casts what may well be a substantial adverse effect on the interests of the petitioning parties.'" *Id.* (citation omitted). Accordingly, the Third Circuit "decline[d] to review the agency action at this point." *Id.*

Here, there is no question that the claims raised by JSD are broader than mere legal challenges and would require substantial factual development. Specifically, JSD's Complaint challenges ATF's interpretation of the Gun Control Act and associated regulations as they relate to products that it sells and the manner in which it sells those products (i.e., individually or in combination). JSD's Complaint also engages in a fact-specific explication of instances where (it alleges) ATF has taken a different position with respect to the same products sold by JSD and other similar businesses. Such allegations would require the Court to examine the generalized statements set forth in ATF's cease and desist letter (and the language of its rescission letter) and determine whether, as a matter of fact, ATF's position with respect to JSD's conduct is correct. Moreover, it remains to be seen whether ATF's cease and desist letter, which has no independent legal impact, is indicative of any existing or prospective investigation, prosecution or other action by ATF. These unsettled factual questions weigh against judicial review at this time.

Further, as the Court has already explained in the context of JSD's APA claims, the cease and desist letter is not final agency action and has no impact upon any right or obligation of JSD.

16

The letter, even before rescission, does not impose any independent legal burden. It does not give rise to any civil or criminal liability. Legally, it has no independent effect. This factor also weighs against review.

Finally, while JSD has alleged that the cease and desist letter has caused it great hardship by forcing it to cease operations, it concedes that such action was both cautionary and voluntary. This is not the "immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance" required to support review. *Abbott Lab'ys*, 387 U.S. at 153. Rather, as explained repeatedly above, the cease and desist letter had no legal impact and cannot actually mandate, upon penalty of law, any conduct by JSD. Though JSD expresses concern about prosecution, the issuance of a cease and desist letter is not a prerequisite to prosecution. JSD may be prosecuted with or without a cease and desist letter. Or it may never be prosecuted at all. Where claims rest upon "contingent future events that may not occur as anticipated, or indeed may not occur at all," they are not ripe for review. *Texas*, 523 U.S. at 300 (citation omitted); *see also Sherwin-Williams Co.*, 968 F.3d at 272 ("Claims based merely upon assumed potential invasions of rights are not enough to warrant judicial intervention.").

The Court holds that JSD's claims are not ripe for review at this time. There are too many uncertainties and contingencies for the Court to be able to properly exercise its jurisdiction. The ripeness doctrine's purpose "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements" would be thwarted by the Court's review at this time. *Abbott Lab'ys*, 387 U.S. at 148. This case simply has not "taken on fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on the adversaries, and some useful purpose to be achieved in deciding them." *Wyatt*, 385 F.3d at

806 (citation omitted). JSD's claims are not ripe. It is not, therefore, reasonably likely to succeed on their merits. Preliminary injunctive relief must be denied.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's Emergency Motion for Temporary Restraining Order and/or Preliminary Injunction (ECF No. 2) will be denied. An Order of Court will follow.

BY THE COURT:

_____
WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

__6/9/2022__
Dated